Philip H. Gordon, ISBN 1996
Bruce S. Bistline, ISBN 1988
Gordon Law Offices,
623 W. Hays Street
Boise, ID 83702
Tel: (208) 345-7100
Fax: (208) 345-0050

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
email: lrosen@rosenlegal.com
email: pkim@rosenlegal.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LESLIE NIEDERKLEIN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) Case no.: |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** |
| | ) **FOR VIOLATION OF FEDERAL** |
| vs. | ) **SECURITIES LAWS** |
| PCS EDVENTURES!.COM, INC., ANTHONY A. MASHER, and SHANNON M. STITH, | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) ) ) |

1

Plaintiff Leslie Niederklein, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges for this Complaint the following upon knowledge, with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*, (a) review and analysis of relevant filings made by PCS Edventures!.com, Inc. ("PCS" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories about the Company; and (d) information readily obtainable on the internet.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of himself and all other persons or entities (the "Class") who purchased the securities of PCS for the time period between March 28, 2007 through August 15, 2007, and who were damaged thereby.  Plaintiff seeks to recover damages caused by Defendants' violation of Sections 10(b) and Rule 10b-5 thereunder, and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      PCS develops and markets educational learning labs and curricula and related software and technology.

3.      On March 28, 2007, PCS announced a purported sale to its Middle East distributor, Global Techniques a/k/a PCS Middle East ("PCS Middle East").  The press release stated that PCS had entered into a license agreement with PCS Middle East for a fixed license fee of $7.15 million.

2

The announcement was materially false and misleading, because PCS Middle East did not have the ability to pay $7.15 million without first obtaining a contract and receiving funds from the Kingdom of Saudi Arabia ("Saudi Arabia"). PCS Middle East did not, however, have a contract with Saudi Arabia. PCS officers knew there was no contract with Saudi Arabia.

4.      On March 29, 2007, PCS filed a Form 8-K with the Commission. The Form 8-K announced the purported $7.15 million license agreement and stated that full payment would be received by PCS no later than May 15, 2007.

5.      During May 2007 through August 2007, PCS issued additional press releases and filed a Form 8-K/A and a Form 10-KSB, all of which contained materially false and misleading representations or omissions related to the purported license agreement.

6.      The false and misleading information regarding the purported license agreement and $7.15 million in revenue caused the price and trading volume of PCS's stock to be artificially inflated.

7.      It was not until August 26, 2010, when the SEC instituted a civil action against PCS and others, did any reasonable investor or class member could have reasonably suspected that Defendants' misstatements about its purported $7.15 million sales contract was made with scienter.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Defendant maintains its principal executive offices in this District and many of the acts and transactions alleged herein, including the preparation and dissemination of statements containing materially false and misleading information and omissions of material fact, occurred in substantial part in this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff Leslie Niederklein, as set forth in the accompanying certification, incorporated by reference herein, purchased PCS Stock at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant PCS is an Idaho corporation headquartered in Boise, Idaho. At all relevant times herein, the Company's principal executive offices were located at 345 Bobwhite Court, Suite 200, Boise Idaho, 83706. PCS's stock was listed on the NASDAQ Bulletin Board under ticker "PCSV."

14.     Defendant Anthony A. Maher ("Maher"), served as the Company's Chairman of the Board, President, and Chief Executive Officer since 1989. Since March 2010, Maher has served as Chairman of the Board and Chief Executive Officer.

15.     Defendant Shannon Stith, f/n/a Shannon Wilson ("Stith"), served as the Company's Vice President and Chief Financial Officer from September 1, 2006 to January 11, 2008.

4

16.     Maher and Stith are collectively referred to herein as the "Individual Defendants."

17.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(g)     approved or ratified these statements in violation of the federal securities laws.

18.     PCS is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to PCS under *respondeat superior* and agency principles.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased securities of PCS during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PCS' securities were actively traded on the NASDAQ Bulletin Board.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by PCS or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, prospects, sales, operations and management of PCS; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

26.     The Class Period begins on March 28, 2007 when the Company issued a materially false and misleading press release announcing a "sale to PCS Middle East."  The announcement states in relevant part:

PCS EDVENTURES! ANNOUNCES SALE TO PCS MIDDLE EAST
Boise, Idaho - March 28, 2007 - PCS Edventures!.com, Inc. (OTCBB: PCSV- News) today announced the signing of a License Agreement for Educational Curriculum and Content with PCS Middle East, its sales and distribution partner in the Middle East.  The License Agreement is for a fixed license fee in the amount of Seven Million One Hundred Fifty and No/100 US Dollars ($7,150,000) for the following titles from the PCS BrickLab(r) curriculum series: PCS BrickLab(r) ITEA: Grade Series Level 1, PCS BrickLab(r) ITEA: Grade Series Level 2, PCS BrickLab(r) ITEA: Grade Series Level 3, PCS BrickLab(r) ITEA: Grade Series Level 4, and PCS BrickLab(r) Survey for Level 5.  This fixed license fee enables PCS Middle East to translate, localize, and deliver these titles in up to 5,500 sites in the Kingdom of Saudi Arabia, which is part of a larger initiative to deploy the full PCS

STEM modules into the Kingdom of Saudi Arabia and throughout other Arabic speaking countries in the Middle East.

Dr. Mohammed Yasser Refai, Managing Director of PCS Middle East, said "I am delighted to have executed this Agreement to begin the fulfillment of our projects here in the Middle East that I have been cultivating now for over four years. The PCS student centered methods and emphasis on hands-on methodologies promises to transform our educational systems here in the Middle East, and we are excited to begin this process with this large scale deployment of the PCS BrickLab(r) technology education series."

Tony Maher, PCS Edventures!.com, Inc. Chairman, President, and CEO, said, "We are very pleased to see the several years of hard work that went into the development of the various pilots and programs now starting to pay off. This license for part of the primary stage curriculum solution represents a small subset of our total Science, Technology, Engineering, and Mathematics (STEM) systemic solution that will be implemented into the Middle East. We are happy to see this moving forward in the Middle Eastern region and congratulate Dr. Refai on his success."

27.     This announcement caused the Company's stock to rise 43% from $.65 per share to $.93 per share on extraordinary volume.

28.     On May 17, 2007 the Company filed a materially false and misleading amended Form 8-K with the SEC in which the Company claimed that payment under the purported license agreement had not been received by May 15, 2007, as previously announced. The 8-K states in relevant part:

Item 1.01. Entry into a Material Definitive Agreement.

On March 27, 2007, PCS Edventures!.com, Inc. (PCS) entered into a License Agreement for Educational Curriculum and Content with Global Techniques dba PCS     Middle East (PCS ME). The License Agreement allows PCS ME to utilize and reprint copies of a portion of the PCS BrickLab(r) curriculum, namely PCS BrickLab(r) ITEA Grade Series Level 1, 2, 3, and 4, and PCS BrickLab(r) Survey Level 5 in up to 5,500 sites within the Kingdom of Saudi Arabia. For use of this portion of the PCS BrickLab(r) curriculum, PCS ME has agreed to pay PCS the sum of Seven Million One Hundred Fifty Thousand and No/100 US Dollars ($7,150,000). Full payment was expected to be received in a single sum payment no later than May 15, 2007. However, PCS ME experienced delays within the Kingdom of Saudi Arabia. These delays caused a postponement in payment to PCS ME, thus causing delays in payment to PCS. These delays stemmed from the uniqueness of the project, wherein the Royal Council and the Ministry of Education held special meetings to discuss, finalize, and

8

assign this project. Upon receipt of payment from PCS ME, the Company will file Amendment 2 to this 8K notifying all persons of receipt of payment.

The License Agreement is in conjunction with the Global Techniques International Distribution Agreement between PCS Edventures!.com, Inc. (PCS) and Global Techniques, wherein PCS agreed to allow Global Techniques to be the exclusive distributor of PCS products in the Middles East, specifically Algeria, Bahrain, Egypt, Iran, Iraq, Jordan, Lebanon, Libya, Kuwait, Oman, the Palestinian Territories, the Kingdom of Saudi Arabia, Syria, Tunisia, Turkey, Qatar, the United Arab Emirates, and Yemen. The International Distribution Agreement is for a term of twenty-five (25) years, after which time it will automatically renew for ten (10) year periods.

29.     On June 28, 2007, PCS issued a press release announcing that it had elected to postpone the recognition of the purported $7.15 million license revenue because of delays in Saudi Arabia, which "resulted in a postponement in payment to PCS Middle East, thereby causing delays in payments to PCS Edventures! by PCS Middle East." Maher was quoted in the press release as saying, "Our decision does not suggest that any projects in Saudi Arabia that were the subject of the original invoice are not going forward, but it means that such projects will likely commence later than our initial expectations."

30.     On June 29, 2007 the Company filed with the SEC its annual report for the fiscal year ended March 31, 2007, which repeated the Company's misstatements about its purported license agreement with PCS Middle East. The 10KSB reiterated that PCS had a material contact with PCS Middle East for a fixed license fee to sell its product in Saudi Arabia, but stated that delays had been experienced and funds had yet to be received. The 10KSB was signed and certified by defendants Maher and Stith pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 attesting the accuracy and completeness of the 10KSB.

31.     The above announcements were materially false and misleading because they failed to disclose that PCS Middle East never had a contract with Saudi Arabia and that PCS Middle East was

unable to pay under the license agreement without first obtaining a contract and advance payment

from Saudi Arabia.  According to the SEC, PCS, Maher, and Stith knew that there was no contract

with Saudi Arabia, but failed to disclose the information.

32.   On August 15, 2007, PCS issued a press release concerning the purported contract.

Contrary to the Company's statements set forth above, the press release revealed that there was no

current contract nor was a contract likely to exist in the near future.

PCS Edventures! Provides Update on Saudi Education Initiative

BOISE, ID -- (MARKET WIRE) -- 08/15/07 --  PCS Edventures!.com, Inc. (OTCBB:
PCSV) today released an update on the status of the education initiative in Saudi Arabia.

"There has been much speculation over the past 90 days regarding the status of this initiative
in Saudi Arabia," stated Tony Maher, Chief Executive Officer of PCS Edventures.  "We
would like to address our current understanding of the status of the project, at least as it
relates to our Company going forward.

"This initiative is by all accounts a massive undertaking in Saudi Arabia. We applaud the
King's and the Saudi Ministry of Education's efforts to address the educational needs of all
Saudi children with new but proven teaching methods and current technology, and we are
honored to be considered as a potential participant in the initiative through PCS Middle East
and its principal, Dr. Mohammed Yassir Refai, our independent Distributor.

"For many months Dr. Refai and PCS Middle East have been assuring us,  and we have
relied upon such assurances, that PCS Middle East is going to be awarded a contract or some
appropriate form of formal agreement to provide teacher training, curriculum, and our
Company's products to the initiative or the Ministry of Education.  In turn, such a project
would result in our Company providing products and services to and through PCS Middle
East, as our distributor, in return for what we believe would be significant financial
consideration to PCS Edventures under agreed-upon prices.

"To date, however, in spite of our continued efforts through Dr. Refai and others to
determine when and to what extent such a contract or contracts would be forthcoming, we
have been unable to confirm a timeframe or other specifics regarding any such contracts.  In
late March 2007, we were assured and relied upon Dr. Refai's statements that a contract or
contracts were imminent, and consequently, we received a purchase order for the initial site
licenses from PCS Middle East to which we responded with an announcement.  As we
reported a few weeks ago, unfortunately, because whatever form of contract or formal

10

agreement between PCS Middle East and the appropriate Saudi governmental agency has not to our knowledge materialized, apparently been formalized, or announced, that purchase order transaction was not and still has not been funded, in spite of the initial assurances that it was going to be.   More recently we asked Dr. Refai to confirm, with some specific documentation, the status of the project and PCS Middle East's involvement, but to date this information also has not been received. There have been, however, several releases in the Saudi press that lead us to believe the project is going forward, and Dr. Refai has continued to assure us that we are part of that project.  Dr. Refai has also continued to state to us, as recently as the last few days, that a contract is going to be awarded to PCS Middle East that would in turn trigger our involvement.

"As part of our efforts to prepare for delivery of the services and products required for this initiative, our employees have done a great deal of work, and we have provided the necessary and requested information to PCS Middle East to facilitate our licensee to pursue its and our Company's involvement in the initiative.    Fortunately, our efforts will enable PCS Edventures to utilize the same developments in other projects and offerings both in the United States and elsewhere.  Further, we firmly believe that, if the Saudi initiative goes forward with the type of products, curriculum, and services we are able to provide, PCS will be involved, and not a substitute or duplicate contractor.  We are still hopeful, and continue to receive oral assurances from Dr. Refai, that a contract or contracts will be issued. However, under the circumstances, and given the lack of any material developments so far as we are aware, it is appropriate for us to focus on our core business and other projects, both international and domestic, and we are doing so.

"In short, we currently do not know when our Company will be called upon to participate in the initiative through our independent licensee.  We appreciate and remain respectful of the cultural differences and manner of doing business in Saudi Arabia as it may affect our involvement in the project.  We are fully prepared to play a significant role in the initiative when it moves forward.  Meanwhile, we will continue to seek information from Dr. Refai and others about the status and progress of the project, and if and when material developments occur, we will so inform our shareholders," concluded Maher.

33.    The August 15, 2007 press release caused the Company's stock to fall from $.90 per share to $.56 per share, or 37.7%.

34.    The August 15, 2007 press release was independently materially false and misleading as it falsely claims that the Company had relied on assurances from its customer that a contract was or was going to be awarded.  The reality is, according to the SEC complaint filed on August 26, 2010 and amended complaint filed on September 8, 2010, Defendants were fully aware that there was no

11

contract with Saudi Arabia and that there was no valid contract with PCS Middle East at all times during the Class Period.

## LOSS CAUSATION AND DAMAGES

35.     The market for PCS's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, PCS's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired PCS securities relying upon the integrity of the market price of PCS's securities and market information relating to PCS, and have been damaged thereby.

36.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PCS's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about PCS's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of PCS and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading

statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**Applicability of Presumption of Reliance:**
**Fraud-On-The-Market Doctrine**

38.     At all relevant times, the market for PCS common stock was an efficient market for the following reasons, among others.

(a)     PCS  stock met the requirements for listing, and was listed and actively traded on the NASDAQ Bulletin Board, a efficient and automated market;

(b)     During the Class Period, on average, hundreds of thousands of shares of PCS stock were traded on a weekly basis, demonstrating a very active and broad market for PCS stock and permitting a very strong presumption of an efficient market;

(c)     As a regulated issuer, PCS filed periodic public reports with the SEC and the NASDAQ Bulletin Board;

(d)     PCS regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     PCS was followed by securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms;

(f)    Numerous NASD member firms were active market-makers in PCS stock at all times during the Class Period; and

(g)    Unexpected material news about PCS was reflected and incorporated into the Company's stock price during the Class Period.

39.    As a result of the foregoing, the market for PCS's common stock promptly digested current information regarding PCS from all publicly available sources and reflected such information in PCS's stock price. Under these circumstances, all purchasers of PCS common stock during the Class Period suffered similar injury through their purchase of PCS's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

40.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PCS who knew that those statements were false when made.

## FIRST CLAIM

**Violation of Section 10(b) of**
**The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell PCS's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

43.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and/or sellers of the Company's securities in an effort to maintain artificially high market prices for PCS' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

44.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of PCS as specified herein.

15

45.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PCS' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PCS and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers and/or seller of PCS' securities during the Class Period.

46.     Each of the Individual Defendants' primary liability, and controlling person liability, arise from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of these Defendants was aware of the Company's dissemination of information to the investing public that he knew or recklessly disregarded to be materially false and misleading; and (5) each of these Defendants culpably participated in the wrongful conduct alleged herein.

47.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PCS' operating condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

48.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PCS' securities was artificially inflated or distorted during the Class Period.  In ignorance of the fact that market prices of PCS' publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired and/or sold PCS securities during the Class Period at artificially high and/or distorted prices and were or will be damaged thereby.

49.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding PCS' financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired or sold their PCS securities, or, if they had acquired or sold such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

50.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

52.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff' purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This second claim is asserted against defendants Jacobson and Dumont.

55.     The Individual Defendants acted as controlling persons of PCS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency,

and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of all aspects of the Company's "commercial sales" to Microsoft and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

56.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.     As set forth above, PCS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

58.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

59.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiff's counsel as Class Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: September 17, 2010.                    Respectfully submitted,



_____/s/_____
Philip H. Gordon, ISBN 1996
Bruce S. Bistline, ISBN 1988
Gordon Law Offices,
623 W. Hays Street
Boise, ID  83702
Tel:  (208) 345-7100
Fax:  (208) 345-0050

Laurence Rosen, Esq.
Phillip Kim, Esq.
350 Fifth Avenue, Suite 5508
New York, NY  10118
Phone: (212) 686-1060
Fax: (212) 202-3827

*Attorneys for Plaintiff*